JOSEPH A. BRODERICK, as Superintendent of Banks of the State of New York, Plaintiff, *v.* MAX AARON and Others, Defendants.

Supreme Court, New York County, July 2, 1934.

*Carl J. Austrian* [*Arthur Ofner, Harold N. Cohen, Louis Newman, Edward Garfield, Maurice Cohen, Edward Weitz* and *Isidore H. Cohen* of counsel], for the plaintiff.

Numerous attorneys and counsel for the defendants.

LYDON, J.   I wish to indicate briefly the general views by which I have been governed in passing on the claims to indemnification of stockholders of record who have been held liable to assessments on their stock in The Bank of United States.

Under the statute the stockholder of record is always liable to assessment.   But if he has parted with his ownership prior to the closing of the bank he is entitled to indemnification by the real owner.   (*Johnson* v. *Underhill*, 52 N. Y. 203.)   He cannot transfer legal title to his shares except by delivery of his certificates.   (Pers. Prop. Law, § 162.)   But it is enough if he has vested the equitable title in another.   The equitable owner must indemnify him. (*Broderick* v. *Aaron*, 264 N. Y. 368.)

Shares of stock are not " goods " within the meaning of our Sales Act.   If they were, they would be " unascertained goods " and sold " by description " (Pers. Prop. Law, §§ 98, 100), except, in those rare cases where the certificate was produced and delivered or otherwise identified at the moment of sale.   We may disregard such exceptional cases for they present no difficulty.   The problems arise where, at the time of sale, there is no express identification of the particular shares sold.   If A sells his particular ten shares of the bank stock to B, the equitable title passes to B at the time of the sale (*Currie* v. *White*, 45 N. Y. 822), though the legal title does not pass until delivery of the certificate.   But if A sells ten shares of the bank stock to B, without further identification, when does the equitable title pass?   I think the answer must be that the same principles which govern the passing of legal title to goods under the Personal Property Law must be applied, by analogy, if not from necessity, to the determination of the equitable title.   (*Agar* v. *Orda*, 264 N. Y. 248.)   In other words, in the case supposed, the equitable title will not pass until the vendor has made an unconditional appropriation of particular stock to the contract of sale and has done so with the consent of the buyer, express or implied. Since, by the custom of the trade, the seller is always at liberty to deliver any certificates in performance of any contract, the implied consent of the buyer to any allocation the seller may elect to make may be assumed.

Suppose that A is the owner of ten shares.   He owns no other stock of the bank.   On December 10, 1930, he sells ten shares to a

dealer by direct communication and without the intervention of a broker. The bank closes on the evening of December tenth. The Superintendent takes possession the next morning and the bank is not allowed to reopen. A delivers his stock to his vendee on the eleventh, as he has the right to do under his contract, and the vendee accepts and pays for it. Later A is assessed and demands reimbursement from his vendee. I think in such a case A would be entitled to recover provided his vendee still had the equitable title when the bank closed. A was obviously selling the only stock he owned and must necessarily have intended to allocate his particular ten shares to the contract he made.

But suppose A owned ten shares standing of record in his own name and ten shares standing of record in the name of X. If the bank fails he will be unconditionally liable to assessment on the ten shares standing in his own name whether he then owns them or not. He will also be liable to assessment on the ten shares standing in the name of X if he still owns them and if the Superintendent elects to sue him. (Banking Law, § 120.) If the Superintendent enforces the assessment on those ten shares against X the obligation to indemnify X will rest upon A if X chooses to pursue him.

This being the situation, on December tenth A sells ten shares to B, a dealer in bank stocks. He does nothing by way of allocation of any particular shares to the contract. He is not required to make delivery until December eleventh. On the morning of December eleventh he finds that the bank has failed. He has the right to deliver either of his two certificates in performance of his contract. May he then, by electing to deliver to B the ten shares standing in his own name, entitle himself to indemnity from B for any assessment later made against him on those shares? I think not. The allocation was too late. On December tenth, when the bank closed, A was both the legal and equitable owner of the twenty shares. He had not delivered either of the certificates to B and he had failed to make any allocation of either of them to his contract with B. He could not, by an allocation on December eleventh, affect the status of the equitable title on the day before. A would have to bear the burden of the assessment himself. He had been one day too late in getting rid of his title to the stock.

I have supposed the simple case of an owner dealing directly with his vendee. Where the sale is made through a broker the same principles must be applied. But in that case an allocation by the broker must appear. Where a broker holds particular certificates for a customer and the customer orders his stock sold it will be assumed that the broker allocates the customer's stock to the contract of sale, unless by the subsequent delivery of other

certificates he shows that he has not done so, or unless his customer's stock stood in different names and was sold to different persons without allocation between them.

In transactions between dealers trading for their own account there is equal need of showing a timely allocation of particular shares to particular contracts. But in such cases there is usually no proof of allocation prior to delivery of the certificates to the purchaser, and no room for any implication of an allocation.

Another case may be supposed for the sake of illustrating the application of these principles.

A, B and C each own ten shares standing of record in his own name. During the morning of December tenth each of them sells his ten shares to D, a dealer. In the afternoon of the same day D sells ten shares to X, ten shares to Y and ten shares to Z. No allocation of any particular shares to the several contracts of sale is made by D. A, B and C deliver their respective certificates to D on December eleventh and on December twelfth he delivers A's certificate to Z, B's certificate to Y and C's certificate to X. A, B and C are later assessed. A demands indemnity from Z. He must fail because Z did not become the owner of A's stock, either at law or in equity. until after the bank closed. A must recover, if at all, from D.

The question of the identity of shares claimed to have been resold by dealers was raised in *Broderick* v. *Aaron* (240 App. Div. 94, 95), but it was unnecessary to pass on that point in view of the conclusion there reached that the immediate vendee of the stockholder of record was liable to him. When that case reached the Court of Appeals the certified question assumed that the shares resold by the first purchaser were the shares purchased from the holder of record (264 N. Y. 368).

### Dealers Who Were Short of the Bank Stock When the Bank Closed.

In some cases it has been shown that although certain stock had been sold to dealers and had been so allocated by the vendor to the contract of sale as to pass the equitable title, yet the dealers, before the closing of the bank, had taken a short position in the stock and were still short when it closed. It has been urged that under such circumstances the dealer cannot properly be held liable to indemnify the stockholder of record for the assessment made against him. Since the dealer had sold more stock than he owned or had contracted to purchase, it is contended that he must necessarily be held to have sold the stock upon which it is sought to hold him liable.

I took this view in *Broderick* v. *Adamson* (148 Misc. 353, 365, 375) but further reflection has convinced me that it is unsound. The

assessment necessarily rests upon the proposition that equitable title to the particular stock assessed vested in the dealer before the bank closed. If so, he can only rid himself of liability by showing that he had divested himself of that title before the closing of the bank. This he cannot do by merely showing that he had made executory contracts to sell unidentified shares. It would be necessary for him to show that he had allocated the particular shares, before the closing of the bank, to a particular contract of sale.

A broker may be presumed to have allocated his customer's stock to a contract of sale made for that customer, as it is his duty to do. There is no room for any such presumption in the case of a dealer who sells his own stock for his own account.

### Brokers Carrying Stock for Customers.

Where brokers have shown that they were carrying stock for customers on margin and that they had procured certificates to be issued in their own names, without allocating particular certificates to particular customers, I have held that the brokers are entitled to indemnity from the customers for whom the stock was being carried in the proportion which their respective holdings bore to the total number of shares so carried. No question of equitable title is involved in such a case. The recovery rests on the principles of agency. The brokers had the right to put the stock in their own names as security for the accounts, and the resulting assessment was a liability incurred in the proper performance of their agency.

### Undisclosed Principals.

It has been contended that where a broker purchases stock for a customer but does not disclose his principal or, perhaps, does not even disclose that he is acting as a broker or agent in making the purchase, he may not be allowed to show, as against his vendor, that he was not making the purchase for his own account. It is said that if he acts as agent for an undisclosed principal he becomes liable as a principal and, as such, must indemnify the owner of record who has been assessed. A sentence from the recent opinion of the Court of Appeals in *Broderick* v. *Aaron* (264 N. Y. 368, 376, 377) is quoted in support of this contention. But the sentence quoted carefully restricts the discussion to contractual obligations. We are not here concerned with obligations of that kind but with an obligation imposed by equity and in no way resting on contract. The determinative question is one of equitable title and the rule with respect to the contractual liability of undisclosed principals in no way affects the inquiry into the question of equitable title.